## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| ANN EDENFIELD LEMLEY, as | ) | |
| Administrator of the Estate of | ) | |
| WILLIAM JACOB WADE, | ) | |
| Deceased, and ANN EDENFIELD | ) | |
| LEMLEY, Individually, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. _____ |
| | ) | |
| vs. | ) | |
| | ) | |
| RED BULL NORTH AMERICA, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT AND DEMAND FOR CIVIL JURY TRIAL

COMES NOW ANN EDENFIELD LEMLEY, as Administrator of the Estate of WILLIAM JACOB WADE, Deceased, and ANNE EDENFIELD LEMLEY, Individually, Plaintiffs in the above-captioned matter, and by and through their attorneys hereby complain of defendant RED BULL NORTH OF AMERICA, INC. and respectfully allege, upon information and belief, as follows:

## NATURE OF THE CASE AND THE PARTIES

1.    On October 21, 2015, the Probate Court of Chatham County, Georgia, appointed ANN EDENFIELD LEMLEY as Temporary Administrator of the Estate of WILLIAM JACOB WADE. Plaintiff-Administrator ANN EDENFIELD LEMLEY ("Ms. Lemley") brings this action as a result of the pain and suffering

and death of Plaintiff-Decedent WILLIAM JACOB WADE ("Mr. Wade") on August 8, 2014 following his ingestion of toxic amounts of caffeine and other chemicals through his consumption of RED BULL "energy drink." Ms. Lemley is a resident of the State of Georgia, County of Chatham and is the surviving mother of Mr. Wade.

2.    Defendant RED BULL NORTH AMERICA, INC. ("Defendant") is a foreign profit corporation registered with the State of Georgia, with its principal place of business located at 1740 Steward Street, Santa Monica, California, 90404. At all times pertinent hereto, Defendant was engaged in and responsible for the design, manufacture, production, testing, study, inspecting, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of the energy drink named RED BULL.  Defendant may be served through its registered agent of service, C T CORPORATION SYSTEM, 1201 Peachtree Street, NE, Atlanta, GA 30361.

## JURISDICTION AND VENUE

3.    Plaintiffs bring their complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

4.    Venue is proper in the Southern District of Georgia, under 28 U.S.C. 1391(b), in that Ms. Lemley is located in this state and district, and a substantial

part of the acts and/or omissions giving rise to Plaintiffs' claim occurred in this district.

## FACTUAL ALLEGATIONS

5.    Mr. Wade was born in Savannah, GA on New Year's Eve in 1969 and attended local schools including St. Paul's, Memorial Day, Armstrong State and Georgia Southern University. He grew-up in and around his family antiques' businesses and shared a lifetime love of antiques and Savannah's history. He was co-owner of Old Savannah Estates, Antiques & Auction Co. and Furniture Doctor and was an antiques dealer, appraiser, expert woodcraftsman, businessman and lead auctioneer for the company. He was a lucky fisherman, a talented musician, a writer of lyrics and scores, a designer and creator of beautiful objects of art. He died at the of age 44.

6.    Since 2009, Mr. Wade regularly consumed approximately four 12-ounce cans of RED BULL "energy drink" per day. Typically, he consumed one can in the morning, one before lunch, one in the afternoon, and a fourth and final can in the evening.

7.    More specifically, on August 7, 2014, Mr. Wade consumed a 12-ounce can of RED BULL "energy drink" at approximately 8:00 p.m. and another 12-ounce can the following morning of August 8, 2014. Subsequently, on August

8, 2014, he was found unresponsive. At around 2 p.m. on August 8, 2014, he was pronounced dead.

8.      The autopsy report states that Mr. Wade "died as the result of aortic dissection."

9.      On April 1, 1987, RED BULL "energy drink" (hereinafter referred to as "RED BULL") was sold for the very first time in Austria. Today, RED BULL is available in more than 165 countries and more than 35 billion cans of RED BULL have been consumed so far. Defendant's website proudly claims: "RED BULL has been giving wings for more than 25 years." In 2012 alone, Defendant sold about 5.2 billion cans of RED BULL. A total of 4.631 billion cans of RED BULL were sold worldwide in 2011 alone, resulting in revenue of $5.7 billion.

10.      Studies and reports dating back to 2000 have shown that RED BULL drink (alternatively referred herein as "Red Bull" or "RED BULL") has caused fatal cardiovascular injuries to consumers, such as Mr. Wade. More specifically, in 2000, Ross Rooney, a first-year student in Limerick University, Ireland, died during a basketball match after drinking RED BULL. On or about November 15, 2000, a jury in Dublin questioned the role of RED BULL in the untimely death of this 18-year old athlete.

11.      On or about July 12, 2001, BBC News reported that RED BULL was under investigation in Sweden following three deaths. Two of the three of victims

ingested RED BULL mixed with vodka. The third victim ingested RED BULL after exercising.

12.     In or about February 2004, Europe's highest court upheld a French ban on RED BULL, citing health concerns over the energy drink. France and Denmark have similarly banned RED BULL.

13.     In or about September 2006, a 40-year old supermarket worker, who regularly ingested RED BULL, died from cardiac arrest. The pathologist found that RED BULL may have contributed to the untimely death of this man from Oxford, England.

14.     On or about August 15, 2008, Scott Willoughby of the Cardiovascular Research Centre at the Royal Adelaide Hospital, published a study that showed "that normal people develop symptoms normally associated with cardiovascular disease" after drinking RED BULL. Dr. Willoughby concluded that "drinking just one can of RED BULL energy drink may be enough to increase dramatically the risk of developing life-threatening blood clots, even in healthy young people." Dr. Willoughby also concluded that "[d]espite the drinks' promotional promise to give its costumers 'wings', Australian researchers who studied the caffeine-laden beverage say it may increase the risk of symptoms commonly associated with heart disease." He also concluded that "[i]f you get an increase in stickiness and a decreased ability of the blood vessels to stop its stickiness, that adds up to the bad

situation" and that "[i]f you add in other risk factors for cardiovascular disease – stress or high blood pressure – this could potentially be deadly."

15.    On or about August 18, 2008, *Clinical Autonomic Research* published an article entitled "Reversible Postural Tachycardia Syndrome Due to Inadvertent Overuse of Red Bull," which outlined the following findings: "Postural tachycardia syndrome associated with a vasovagal reaction was recorded in a young volleyball player after an excess intake of Red Bull as a refreshing energy drink. Considering the widespread use of Red Bull among young people who are often unaware of the drink's drug content, this case report suggests Red Bull be considered a possible cause of orthostatic intolerance."

16.    In or about September 2008, a British student died in a nightclub after consuming approximately four cans of RED BULL.  RED BULL was considered as a partial contributor to the untimely death of this 21-year old.

17.    On or about January 5, 2009, the *MJA* published a medical article related to the death of a young man following consumption of "energy drinks" containing caffeine and taurine, as found in RED BULL. The article's findings can be summed up as follows:

> An otherwise healthy 28-year old man had a cardiac arrest after a day of motorcross racing. He had consumed excessive amounts of a caffeinated "energy drink" throughout the day. We postulate that a combination of excessive ingestion of caffeine- and taurine-containing energy drinks and strenuous physical activity can

produce myocardial ischaemia by inducing coronary vasospasm.

The article also stated: "Both taurine and caffeine have been shown in vitro to have physiological effects on intracellular calcium concentration within vascular smooth muscle, and they can conceivably induce coronary vasospasm. In-vivo studies have demonstrated a capacity for caffeine to decrease myocardial blood flow during exercise. We postulate that, in physiologically predisposed individuals, *a combination of excessive ingestion of caffeine- and taurine-containing energy drinks and strenuous activity can induce coronary vasospasm, with potentially fatal results*." Further the article stated: "In-vitro studies have shown that taurine has inotropic effect on cardiac muscle similar to that of caffeine, and *potentiates caffeine-induced muscle contracture*."

15.     On or about January 19, 2011, the *Journal of Medical Case Reports* published an article called "Atrial Fibrillation in Healthy Adolescents After Highly Caffeinated Beverage Consumption: Two Case Reports." The article discussed "the cases of two Caucasian adolescent boys of 14 and 16 years of age at the time of presentation, each without a significant cardiac history, who presented with palpitations or vague chest discomfort or both after a recent history of excessive caffeine consumption. Both were found to have atrial fibrillation on electrocardiogram; one patient required digoxin to restore a normal sinus rhythm, and the other self-converted after intravenous fluid administration." The article

made the following recommendations: "With the increasing popularity of energy drinks in the pediatric and adolescent population, physicians should be aware of the arrhythmogenic potential associated with their consumption. *It is important for pediatricians to understand the lack of regulation in the caffeine content and other ingredients of these high-energy beverages and their complications, so that parents and children can be educated at well visits and sports physicians.* We must inform the public on the potential health hazards related to the excessive intake of caffeine-containing beverages by children and adolescents; the caffeine content of energy drinks should be better regulated and reported on food labels; and the purchase of energy drinks by the young consumer should be more closely monitored."

16.     In or about June 2012, *Cardiovascular Toxicology* published an article called "A Case of Caffeine-Induced Coronary Artery Vasospasm of a 17-Year Old Male." The article described the case of a 17-year old male who was diagnosed with coronary vasospasms as a result of ingesting caffeine.

17.     In or about August 2012, the *Medical Journal of Australia* published an article titled "Energy Drinks: Health and Toxicity." The objective of the article was to "describe the epidemiology and toxicity of caffeinated energy drink exposures in Australia." The article shows the result of a study done related to energy drinks and involved 217 subjects who have ingested energy drinks. *Eighty-*

*seven percent* of these subjects experienced symptoms, the common of which included palpitations, agitation, tremor, and gastrointestinal symptoms. *Twenty-one subjects had signs of serious cardiac or neurological toxicity, including hallucinations, seizures, arrhythmias, or cardiac ischemia*. At least 125 subjects required hospitalizations. The article concluded: "Reports of caffeine toxicity from energy drink consumption are increasing, particularly among adolescents, warranting review and regulation of the labeling and sale of these drinks. Educating adolescents and increasing the community's awareness of the hazards from energy drinks is of paramount importance."

18.    On or about October 29, 2012, *BioMed Research Notes* published an article titled "Hypertension in a Young Boy: An Energy Drink Effect." The article concluded: "*Several studies have reported numerous health hazards including cardiac effects associated with energy drinks.* Warning labeling should be done of these drinks regulating the content of caffeine and its harmful effects on health." The article also concluded: "There are numerous false perceptions in the society about the positive benefits and harmful effects of energy drinks. There is a strong need to create awareness through health education regarding these drinks especially among children as they are exposed to an ever-increasing range and easily accessible energy drinks market. There is also a strong need for legislation regarding mandatory labeling of exact caffeine content of these drinks and with

strong health warning regarding potential health risks. These health warnings must also be included in TV commercials and print media advertisements."

19.    On or about November 16, 2012, the Food and Drug Administration ("FDA") publicly released reports of injuries associated with ingestion of RED BULL. In particular, the FDA "posted 21 reports that had been filed with the agency since 2004 that mentioned Red Bull, including ones that involved hospitalizations for heart problems and vomiting."

20.    On or about November 18, 2012, RED BULL was linked to the death of three Canadians and was linked to serious side effects on 35 other Canadians. The report indicated that "three male teens, two 15-year olds and an 18-year old, died after drinking Red Bull."

21.    Between 2004 and 2012, The Center for Food and Safety Adverse Event Reporting collected reports of events or problems allegedly related to RED BULL. Those events or problems included, but were not limited to, the following: pancreatitis, fatigue, panic attack, anxiety, blurred vision, dizziness, decreased appetite, adrenal insufficiency, insomnia, confusional state, disturbance in attention, dependence, nausea, hyperhidrosis, increased heart rate, chest pain, dyspnea, increased blood pressure, increased heart rate, acute myocardial infarction, intracardiac thrombus, panic attack, irregular heart rate, depressed level of consciousness, sensory loss, flushing, tremor, tachycardia, livedo reticularis,

vertigo, blindness, chest pain, fluctuation in blood pressure, diarrhea, abdominal pain, glossodynia, hypersensitivity, aggression, vomiting, convulsions, and cardiac disorders. Some of these events or problems were life threatening and required hospitalizations.

22.    In 2013, a case report entitled "High-energy Drinks May Provoke Aortic Dissection" discussed the development of aortic dissection of three males following their ingestion of energy drinks such as RED BULL. The authors propose "that uncontrolled consumption of high-energy drinks, especially in patients with underlying heart disease, could provoke potentially lethal cardiovascular event as well as acute aortic dissection."

23.    Most recently, in or about November of 2015, a study from the Mayo Clinic, which was led by Dr. Ana Svatikova and was published online in the *Journal of American Medical Association*, showed a statistically significant increase in the blood pressure and norepinephrine levels of a group of young, healthy adults who consumed one can of energy drink, such as RED BULL. According to this study, acute hemodynamic and adrenergic changes predispose individuals to cardiovascular risks.

24.    At all relevant times, Defendant was responsible for the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing,

advertising, sales, promotion, and/or distribution of the RED BULL that Mr. Wade consumed and from which he ultimately died on August 8, 2014.

25.     RED BULL is marketed as a product that provides benefits to consumers in that it "gives [them] wings" resulting in increased physical and/or mental performance.

26.     Despite Defendant's knowledge of the significant risks associated with consumption of RED BULL, particularly with respect to its target audience, Defendant's product masks and otherwise fails to alert consumers like Mr. Wade of the significant risks associated with the consumption of RED BULL.

27.     Though championing the benefits provided by RED BULL, Defendant entirely failed to warn or disclose to consumers like Mr. Wade the known risks and side effects of consuming RED BULL, including the risk of aortic dissection, hypertension, and other cardiovascular conditions, from which Mr. Wade ultimately died.

28.     Beyond its failure to warn of or disclose to consumers information related to the significant risks associated with consuming RED BULL, Defendant intentionally withheld, suppressed and concealed from consumers' information relating to the risks of adverse health effects upon consumption of this product.

29.     Defendant failed to conduct adequate testing, studies or clinical testing and research, and similarly failed to conduct adequate marketing

surveillance regarding RED BULL's adverse effects upon consumption of this product.

30.    Despite Defendant's representations to the contrary, RED BULL cans consumed by Mr. Wade were not safe or fit for the use for which they were intended.

31.    Had Defendant properly disclosed and warned of the significant risk of suffering adverse effects, including aortic dissection, hypertension, and other cardiovascular problems, due to the consumption of RED BULL, a product containing exorbitant levels of caffeine, taurine, and other harmful chemicals, Mr. Wade would not have purchased and consumed RED BULL.

32.    Defendant's failures in designing, manufacturing, marketing, distributing, warning and/or selling RED BULL directly and proximately caused Mr. Wade to suffer aortic dissection, hypertension, and other cardiovascular problems, and ultimately caused his death on August 8, 2014.

## AS AND FOR A FIRST CAUSE OF ACTION FOR STRICT LIABILITY – DESIGN DEFECT

33.    Plaintiffs re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

34.    Defendant manufactured, sold, and supplied RED BULL and had significant involvement in distribution including the capability of exercising control over quality.

35.     Defendant placed RED BULL into the stream of commerce and RED BULL was expected to, and did, reach Mr. Wade without substantial change in its condition. Mr. Wade consumed RED BULL, causing his hypertension, aortic dissection and other cardiovascular problems, and ultimately, his death.

36.     Mr. Wade consumed RED BULL that caused his death in the way that Defendant intended RED BULL to be used – he ingested them orally.

37.     The RED BULL cans that Mr. Wade consumed, and that caused his death, did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.

38.     At the time the RED BULL consumed by Mr. Wade left Defendant's control, it was in a condition not contemplated by him and was unreasonably dangerous and defective. RED BULL was at the time of Mr. Wade's consumption, and remains to this day, dangerous to an extent beyond that which would be contemplated by the ordinary consumer in his/her position.

39.     RED BULL failed to perform as intended and the circumstances surrounding Mr. Wade's injuries and death exclude all causes other than RED BULL's failure.

40.     The risks associated with ingesting RED BULL outweigh any claimed or perceived benefits. There are practicable, feasible, and safer alternatives to

achieve "energy" and increased awareness that do not present the severe health risks that accompany RED BULL.

41.     The failure of the RED BULL cans that Mr. Wade consumed to perform safely was a substantial factor in causing his hypertension, aortic dissection and other cardiovascular problems, and ultimately, his death.

42.     A reasonable person who knew or should have known of RED BULL's potential for causing injury and of the feasible alternative design would have concluded that RED BULL should not have been marketed in that condition.

43.     As a direct and proximate result of Defendant's design, manufacture, marketing, and/or sale of RED BULL, Plaintiffs, and particularly Mr. Wade, suffered the injuries herein described.

44.     As a direct and proximate result of Defendant's design, manufacture, marketing, and/or sale of RED BULL, it became necessary for Plaintiffs to incur expenses for doctors, hospitals, nurses, pharmaceuticals, and other reasonably required and medically necessary supplies and services.

45.     As a direct and proximate result of Defendant's design, manufacture, marketing, and/or sale of RED BULL, Plaintiffs suffered serious and permanent physical injury, harm, damages and economic loss.

## AS AND FOR A SECOND CAUSE OF ACTION FOR
## STRICT LIABILITY – FAILURE TO WARN

46.     Plaintiffs re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

47.     Prior to Mr. Wade's consumption of RED BULL, Defendant designed, manufactured, marketed, distributed and/or sold RED BULL, and at all material times was in the business of doing so. Defendant placed RED BULL into the stream of commerce.  RED BULL was expected to, and did, reach Mr. Wade without substantial change in its condition. *Mr. Wade consumed RED BULL and it caused his cardiac arrhythmia and death.*

48.     RED BULL had potential risks and side effects that were known or knowable to Defendant by the use of scientific knowledge available at and after the time of design, manufacture, marketing, distribution and/or sale of the RED BULL consumed by Mr. Wade. Defendant knew or should have known of the defective condition, characteristics, and risks associated with RED BULL, as previously set forth herein.

49.     The potential risks and side effects associated with RED BULL presented, and continue to present, a substantial danger when the drinks are used or misused in an intended or reasonably foreseeable way (*i.e.* ingested orally).

50.     Ordinary consumers would not have recognized the potential risks and side effects associated with ingesting RED BULL.

51.     When placing RED BULL into the stream of commerce, Defendant failed to provide adequate warnings as to the risks associated with the product. Defendant failed to warn consumers of the true risks and dangers – and of the symptoms, scope and severity of the potential side effects of RED BULL that Mr. Wade consumed, such as significantly increased risk of hypertension, aortic dissection and other cardiovascular problems.

52.     As detailed herein, Defendants failed to adequately warn and instruct of the potential risks and side effects associated with ingesting RED BULL. Examples of the inadequacies of Defendant's warnings include, but are not limited to, the following: (a) the warnings were insufficient to alert Mr. Wade of the significant risk, scope, duration and severity of adverse events and/or reactions associated with RED BULL, subjecting him to risks that far exceeded the benefits of RED BULL; (b) Defendant marketed and sold RED BULL using misleading advertisement; and (c) Defendant failed to disclose the increased risks of hypertension, aortic dissection, and other cardiovascular problems associated with the consumption of RED BULL.

53.     The lack of sufficient instructions or warnings was a substantial factor in causing Mr. Wade's conscious pain and suffering and death.

54.     As a direct and proximate result of Defendant's failure to provide adequate warnings in connection with its design, manufacture, marketing,

distribution and/or sale of RED BULL, Plaintiffs suffered the injuries herein described.

55.    As a direct and proximate result of Defendant's failure to provide adequate warnings in connection with its design, manufacture, marketing, distribution and/or sale of RED BULL, it became necessary for Plaintiffs to incur expenses for doctors, hospitals, nurses, pharmaceuticals, and other reasonably required and medically necessary supplies and services.

56.    As a direct and proximate result of Defendant's failure to provide adequate warnings in connection with its design, manufacture, marketing, distribution and/or sale of RED BULL, Plaintiffs suffered serious and permanent physical injury, harm, damages and economic loss.

### AS AND FOR A THIRD CAUSE OF ACTION FOR NEGLIGENCE– DESIGN, MANUFACTURE, AND SALE

57.    Plaintiffs re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

58.    Defendant owed a duty to Mr. Wade and all consumers of RED BULL to exercise reasonable care in the design, formulation, testing, manufacture, labeling, marketing, distribution, promotion and/or sale of RED BULL. This duty required Defendant to ensure that its product did not pose an unreasonable risk of bodily harm to Mr. Wade and all other consumers, and similarly required

Defendant to warn of side effects, risks, dangers and potential for adverse cardiac episodes associated with the ingestion of RED BULL.

59.   Defendant failed to exercise reasonable care in the design, formulation, testing, manufacturing, labeling, marketing, distribution, promotion and/or sale of RED BULL in that Defendant knew or should have known that RED BULL could cause significant bodily harm, including cardiac arrhythmia, and was not safe for use by those who ingest the product.

60.   Defendant was negligent in the design, formulation, testing, manufacturing, labeling, marketing, distribution, promotion and/or sale of RED BULL and breached its duties to Plaintiffs and their decedent. Specifically, Defendant: (a) failed to use due care in the preparation and design of RED BULL to prevent the previously-described risks; (b) failed to conduct adequate testing of RED BULL; (c) failed to cease manufacturing or otherwise alter the composition of RED BULL  to produce a safer alternative despite the fact that Defendant knew or should have known that such drinks posted a serious risk of bodily harm to consumers; (d) failed to conduct post-marketing surveillance to determine the safety of RED BULL; (e) failed to exercise reasonable care with respect to post-sale warnings and instructions for safe use by consumers; (f) failed to exercise ordinary care in the labeling of RED BULL; and (g) was otherwise careless and negligent.

61.     At all relevant times, it was foreseeable to Defendant that consumers, like Mr. Wade, would suffer injury as a result of Defendant's failure to exercise ordinary care.

62.     As a direct and proximate result of Defendant's negligence, Mr. Wade suffered the injuries herein described.

63.     As a direct and proximate result of Defendant's negligence, it became necessary for Plaintiffs to incur expenses for doctors, hospitals, nurses, pharmaceuticals, and other reasonably required and medically necessary supplies and services.

64.     As a direct and proximate result of Defendant's negligence, Plaintiffs suffered serious and permanent physical injury, harm, damages and economic loss.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR
## NEGLIGENCE- FAILURE TO WARN

65.     Plaintiffs re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

66.     Prior to, on, and after the date of Mr. Wade's ingestion of RED BULL, and at all relevant times, Defendant was engaged in the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of RED BULL, which was intended for consumption by consumers like Mr. Wade.

67.    Prior to, on, and after the date of Mr. Wade's ingestion of RED BULL, Defendant knew or should have known that RED BULL was dangerous or was likely, to be dangerous when used in a reasonably foreseeable manner. Such dangers include, but are not limited to, significantly increased risks of hypertension, aortic dissection, and other cardiovascular problems.

68.    Prior to, on, and after the date of Mr. Wade's ingestion of RED BULL, Defendant knew or should have known that consumers of RED BULL, including Mr. Wade, would not realize the dangers presented by the product.

69.    Prior to, on, and after the date of Mr. Wade's ingestion of RED BULL, Defendant failed to adequately warn of the dangers associated with consumption of RED BULL and/or failed to adequately instruct consumers on the safe use of the product. Such failures to warn and/or instruct included, but were not limited to: failing to issue adequate warnings to consumers concerning the risks of serious bodily harm associated with the ingestion of RED BULL; failing to supply adequate warnings regarding all potential adverse health effects associated with the use of its product and the comparative severity of these side effects; and failing to set forth adequate warnings directed to consumers with common underlying cardiac conditions that are more susceptible to adverse cardiac reactions.

70.    It was foreseeable to Defendant that consumers, including Mr. Wade, would suffer injury as a result of its failure to exercise ordinary care in providing

adequate warnings concerning the dangers associated with consumption of RED BULL.

71.     As a direct and proximate result of Defendant's negligence, Mr. Wade suffered the injuries herein described.

72.     As a direct and proximate result of Defendant's negligence, it became necessary for Plaintiffs to incur expenses for doctors, hospitals, nurses, pharmaceuticals, and other reasonably required and medically necessary supplies and services.

73.     As a direct and proximate result of Defendant's negligence, Plaintiffs suffered serious and permanent physical injury, harm, damages and economic loss.

### AS AND FOR A FIFTH CAUSE OF ACTION FOR FRAUD

74.     Plaintiffs re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

75.     Defendant withheld and suppressed facts in its advertising, labeling, packaging, marketing and promotion of RED BULL that led consumers to falsely believe that the product posed no greater risk to the health of those who consumed it than did natural supplements containing similar ingredients.

76.     Due to the potential risks associated with consumption of RED BULL, Defendant owed a duty to disclose the truth about the significant adverse health effects associated with the consumption of these drinks, but failed to do so.

77.     Despite Defendant's knowledge of the health risks associated with consumption of energy drinks like RED BULL, Defendant concealed these dangers and took steps in the advertising, packaging, marketing, promotion and/or sale of RED BULL to prevent consumers from learning the true facts about the product.

78.     The concealment of the true facts about RED BULL was done with the intent to induce Mr. Wade to purchase and consume RED BULL.

79.     Defendant intended for consumers, like Mr. Wade, to rely on its advertising, labeling, packaging, marketing, promotion and/or sale of RED BULL, as well as its suppression of the true facts about the risks and dangers associated with consuming RED BULL.

80.     The reliance by Mr. Wade in consuming RED BULL was reasonable and justified in that Defendant appeared to be, and represented itself to be, a reputable business that would disclose the truth about any potential harmful health effects of consuming its product.

81.     As a direct and proximate result of the fraud and deceit alleged, Plaintiffs suffered the injuries herein described.

82.     As a direct and proximate result of the fraud and deceit alleged, it became necessary for Plaintiffs to incur expenses for doctors, hospitals, nurses, pharmaceuticals, and other reasonably required and medically necessary supplies and services.

83.    As a direct and proximate result of the fraud and deceit alleged, Plaintiffs suffered serious and permanent physical injury, harm, damages and economic loss.

## AS AND FOR ALLEGATIONS IN SUPPORT OF PUNITIVE DAMAGES

97.    Plaintiffs re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

98.    At all relevant times, Defendant knew that RED BULL contained dangerous levels of caffeine, taurine, and other chemicals, and knew the serious health risks to consumers associated with the consumption of RED BULL.

99.    With such knowledge and in furtherance of its own financial interests, Defendant willfully, wantonly and maliciously engaged in the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of RED BULL while simultaneously failing to warn potential consumers if its dangerous propensities.

100.    With such knowledge and in furtherance of its own financial interests, Defendant willfully, wantonly and maliciously, and with conscious disregard for, and indifference to, the health and safety of consumers, including Mr. Wade, failed and refused to supply adequate warnings and/or information to protect consumers and/or otherwise reduce or eliminate the health risks to consumers associated with the consumption of RED BULL.

101.   As a direct and proximate result of such conduct, and because the acts and omissions of Defendant were willful, wanton, malicious, intended and in conscious disregard for, and indifference to, the health and safety of potential consumers, like Mr. Wade, an award of exemplary or punitive damages is appropriate and necessary to punish Defendant, and to deter Defendant from engaging in such misconduct in the future and to affect significant change in the way Defendant designs, manufactures, markets, promotes, warns about, distributes and/or sells RED BULL.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR WRONGFUL DEATH

102.   Plaintiffs re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

103.   Ms. Lemley and all other surviving distributees of and successors in interest to Mr. Wade do hereby bring any and all Wrongful Death causes of action.

104.   The wrongful actions of Defendant described in the preceding paragraphs, and the defects in the RED BULL product designed, manufactured, marketed, distributed and/or sold by Defendant, caused the death of Mr. Wade. As a direct and proximate result of the strict liability, negligence, fraud, and breach of warranty described above, Mr. Wade purchased and consumed RED BULL, which resulted in his death on August 8, 2014.

105.   As a result of the death of Mr. Wade, Ms. Lemley and all other distributees were deprived of the love, companionship, comfort, affection, support, and society of Mr. Wade.

106.   Plaintiff and all other distributees are entitled to recover economic and non-economic damages against Defendant for the wrongful death proximately caused by Mr. Wade's consumption of RED BULL and directly attributable to Defendant's failures as described in the preceding paragraphs.

**WHEREFORE**, Plaintiffs request that the Court award them:

(a)   The sum of $5,000,000.00 in compensatory damages for each cause of action;

(b)   Costs and reasonable attorney's fees incurred with this lawsuit with interests thereon;

(c)   Punitive damages in the sum of $30,000,000.00;

(d)   A trial by jury; and

(e)   Any and all other damages and further relief as deemed just.

Respectfully submitted on this 22nd day of February, 2017.

THE BOWEN LAW GROUP
/s/ Charles J. Bowen
CHARLES J. BOWEN
Georgia State Bar No. 071115
*Attorney for Plaintiffs*
7 East Congress Street
Suite 1001
Savannah, GA  31401

(912) 544-2050
(912) 544-2070 (fax)
*cbowen@thebowenlawgroup.com*

MUNAWAR & ANDREWS-SANTILLO, LLP
/s/ James S. Paglinawan
JAMES S. PAGLINAWAN
*Application to be admitted pro hac vice to be filed*
*Attorney for Plaintiffs*
420 Lexington Avenue
Suite 2601
New York, New York 10170
(212) 400-4000
(212) 300-3730 (fax)
*jp@mlawfirm.com*

MUNAWAR & ANDREWS-SANTILLO, LLP
/s/ Ashley Andrews-Santillo
ASHLEY ANDREWS-SANTILLO
*Application to be admitted pro hac vice to be filed*
*Attorney for Plaintiffs*
420 Lexington Avenue
Suite 2601
New York, New York 10170
(212) 400-4000
(212) 300-3730 (fax)
*aas@mlawfirm.com*